Filed 10/5/21  P. v. Gilbert CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> KENYON GILBERT, <br><br>     Defendant and Appellant. | B305234 <br><br> (Los Angeles County <br> Super. Ct. No. TA149373) |

APPEAL from a judgment of the Superior Court of Los Angeles County, H. Clay Jacke II, Judge.  Affirmed.

Tracy L. Emblem, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Kathy S. Pomerantz, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

A jury convicted appellant Kenyon Gilbert of attempted voluntary manslaughter (Pen. Code, §§ 192, subd. (a), 664)[1] and assault with a semiautomatic firearm (§ 245, subd. (b)). Both counts named the same victim, Ernest Beavers. The trial court sentenced appellant to a total of nine years in state prison.

Appellant appeals from the judgment of conviction, contending the trial court violated his constitutional right to confrontation when it did not let him fully question Beavers about prior protective orders he had sought against two women. Appellant also contends the prosecutor committed prejudicial misconduct when he questioned a police detective about surveillance video of the shooting and when he incorrectly stated during closing argument that Beavers testified appellant pointed his gun at Beavers's head. We affirm the judgment.

## BACKGROUND

This was a shootout between appellant and complaining witness Beavers. Each shooter said the other shot first. Appellant's theory at trial was that Beavers was lying and appellant fired second only in self-defense. The shooting occurred in the early morning hours of June 9, 2019 at and around a motel in Compton where Beavers was staying with his girlfriend Ina Jones. Beavers was injured in the shooting and treated at a hospital, where he was questioned by police.

Police officers went to the motel on the day of the shooting and recovered seven .40 caliber casings and one bullet fragment. Six of the casings were found on the street.

---

[1] Further undesignated statutory references are to the Penal Code.

2

Los Angeles Police Department Detective Erik Shear investigated the case. He spoke telephonically with Beavers two days after the shooting, on June 11, 2019, to obtain basic facts. On June 12, Detective Shear obtained surveillance video from the motel. He also found two more .40 caliber shell casings near the back wall of the motel.

The motel's surveillance cameras were motion activated. The People played seven video clips for the jury. Detective Shear narrated the clips. In clip one, appellant is at Beavers's second-floor motel room door. In clip three, Beavers walks downstairs from his room and goes to the security gate. In clip four, Beavers waits by the gate. In clip five, Beavers runs toward the back of the motel and appellant walks toward and through the gate as a puff of powder appeared. (The detective opined the puff of powder came from a bullet hitting a wall or pillar.) In clip six, Beavers tries to clear his gun. In clip seven, Beavers walks toward the gate with his arm extended and fires a shot out of the gate and down the street; a muzzle flash appears. These videos do not show either Beavers or appellant firing a gun inside the motel courtyard.

Detective Shear opined that the video was generally consistent with Beavers's statements to him.[2] In the detective's opinion, the only notable discrepancy was that Beavers did not disclose to Detective Shear that he fired the shot shown in clip seven.

---

[2]     Detective Shear acknowledged at trial that he, the prosecutor, and Beavers watched the video together on the same day of and before Beavers testified at the preliminary hearing.

Beavers testified at trial and provided a fuller account of events. Around 2:37 a.m. on June 9, 2019, Beavers was awakened by banging on the door of his second-floor motel room. Beavers opened the door and saw appellant, whom he did not know and with whom he had never previously spoken.

Appellant asked Beavers where he was from. Beavers replied he was from Missouri and did not "bang." Appellant asked Beavers if he was "serving" or "slanging," which was a way of asking if he was selling drugs. Jones then came to the door, and said, "Kado." At that point appellant moved rapidly towards the stairs. Kado was appellant's nickname and stage name.

Beavers did in fact sell drugs but he testified he did not sell them from the motel because of the motel's surveillance cameras. Beavers was afraid appellant would return, so he retrieved his .380 caliber gun, dressed, and went downstairs. Beavers locked the front security gate of the motel, went back upstairs to check on Jones, and then returned downstairs to wait in case appellant returned. He hoped to talk to appellant and see what the problem was. Beavers had a cell phone but did not call the police.

Beavers had been waiting downstairs 15 to 20 minutes when a black Mercedes SUV pulled up in front of the motel and appellant got out. Beavers opened the security gate so they could talk. As appellant walked through the security gate into the courtyard, his clothing hit the gate and Beavers heard the sound of metal hitting metal.

Jones came out onto the second-floor landing. She said something to appellant who called her a "bitch." Beavers told appellant not to call Jones a bitch. Appellant asked Beavers again if he was selling drugs. Beavers replied he was not. Appellant then asked Beavers to take his hands out of his

4

pockets.  Beavers said, "I'm not taking my hands out of my jacket. We're here to talk."

According to Beavers, appellant backed up and "jacked" his gun in his pants pocket.  The men were about three feet apart. By "jacking" the gun, appellant pulled the slide back and put a round in the chamber.  Beavers tried to reason with appellant. Appellant stepped forward.  Beavers moved forward as well. When appellant "pulled the gun up" Beavers hit it with his hand, moving it toward the ceiling.  The gun went off.  Beavers pulled out his own gun and fired.  He tried to fire a second shot, but his gun jammed.

Appellant continued to shoot, and hit Beavers in the upper part of the arm.  Beavers testified he went into a "cubby-hole" area toward the back of the motel to try to clear the jam in his gun.  He cleared the jam, and left the cubby-hole with the intention to shoot appellant.

Beavers saw appellant squatted down on the side of a wall, outside the motel gate.  Beavers fired out the gate.

Beavers then ran out past the gate and across the street to a tree by a church.  Appellant shot at him.  Beavers went behind the tree and tried to clear his gun, which had jammed again. Appellant got in his car and drove away.  Beavers was scared and panicking.  He ran away from the area, pausing to wrap his gun in a piece of discarded plastic and throw it away. He believed he would be arrested if police found the weapon on him.

Beavers fled to a former residence on 75th Street.  Jones and a friend picked him up from that location and drove him to the hospital.  There he spoke with police officers and was treated for the gunshot wound to his arm.

On cross-examination, Beavers admitted he had been convicted of attempted robbery, residential burglary, narcotics sales and attempted narcotics sales. He was prohibited from possessing a gun. He was also a "third-striker."

Appellant's theory was that Beavers was lying about how events unfolded. Appellant partially impeached Beavers's (anticipated) testimony with some of his pre-trial statements to police.

First, appellant played bodycam footage of the police interview of Beavers at the hospital, but no transcript was provided. On cross-examination, Detective Shear agreed that in the interview, Beavers said appellant shot at him two or three times on the grounds of the motel. The detective also agreed Beavers said he went outside the motel grounds to draw fire away from Jones. Detective Shear also acknowledged Beavers failed to disclose during the interview that he himself was in fact armed and had fired at least one shot.

Next, appellant also questioned Detective Shear about the June 11, 2019, telephonic interview he conducted with Beavers. Generally, Beavers's statements were consistent with his trial testimony. Detective Shear testified that in their interview of June 11, 2019, Beavers acknowledged he was armed, but stated appellant pulled his gun first and pointed it at Beavers's head. Beavers knocked appellant's gun away and it discharged. Beavers than ran to a "cove" area in the back of the motel. Appellant fired at him several more times before appellant left the motel area. Beavers fired out of the gate in appellant's direction. Beavers told the detective he ran out of the motel and across the street to a church. He did not tell the detective he fired another shot at appellant from outside the gate.

6

Appellant also offered a recording of a June 25, 2019 in person interview of Beavers by Detective Shear. Beavers's statements in the interview were generally consistent with his trial testimony, with two notable exceptions. Beavers did not tell Detective Shear he fired a second shot at appellant in the courtyard. Beavers also told the detective that after he ran into the street, he did not fire at appellant.

Appellant was arrested two days after the June 25, 2019 interview of Beavers and a similar interview of Jones, where Jones revealed she knew appellant.

Although he called no witnesses, appellant presented a different picture of the shootout through his examination of the People's witnesses. Detective Shear had interviewed appellant after his arrest. A recording of the interview was played for the jury. Appellant initially denied he was at the motel, even after he was advised there was surveillance video. Eventually appellant admitted he had been at the motel to see a prostitute called "China." He briefly spoke with her through the door and then left when the man with her told him to go. As he walked down the stairs, the same man, Beavers, followed and shot at him. (Detective Shear testified this part of appellant's account was inconsistent with the surveillance video.)

Appellant told Detective Shear he walked away and tried to get in his car, a brown Buick. Beavers fired three more shots at him. Then appellant changed his statement and claimed he was not at the motel on June 9; he was at his girlfriend's apartment.

Appellant also told Detective Shear he did not know Beavers personally but heard he was from "Missou" and had "been a big guy on the block. He supposed to run all that stuff over there. He supposed to beat people up . . . over this . . . girl."

7

Appellant repeated he wanted to talk to China but Beavers would not let him, followed him downstairs, and then tried to kill him.

Appellant left the motel but returned to talk to Beavers. When he reached the motel gate which Beavers opened, Beavers shot at him. Appellant tried to get in his car to leave. Beavers crossed the street and shot at him. Appellant said he was not armed.

Appellant did not call witnesses in his defense.

## DISCUSSION

A. *The Trial Court Did Not Abuse Its Discretion under Evidence Code Section 352 When it Limited Appellant's Cross-Examination of Beavers.*

During cross-examination of Beavers, appellant sought to introduce evidence that Beavers had previously obtained temporary restraining orders against Jones and another woman, Badonna Jarvis, because each had threatened to kill him. Appellant wanted to question Beavers about the nature of the women's threats, specifically that they had threatened to kill him. The People objected, citing Evidence Code section 352. The trial court excluded the nature of the threats and instead permitted appellant to ask "tailored" questions about the protective orders, to show that Beavers "has a recourse other than going downstairs with a gun."

In accordance with the trial court's ruling, appellant did elicit for the jury testimony that Beavers was in fear of Jarvis's and Jones's unspecified threats, that he called the police as to Jarvis, and that he sought the temporary restraining orders in response to each woman's threats.

8

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

We see no abuse of discretion in the trial court's decision to exclude the nature of the threats in response to the People's objection. We agree with the court that it had "limited relevance" and would necessitate an undue consumption of time.

By the time the trial court excluded the nature of the threats, Beavers' credibility had been thoroughly impeached by evidence of (1) his prior convictions for residential burglary, attempted robbery and narcotics sales; (2) a motive to lie to avoid being punished as a third striker; and (3) his repeated omission and minimization of his own acts of shooting at appellant by his incomplete statements to Detective Shear. If appellant's theory was that Beavers had lied about or exaggerated the threats to obtain the two temporary restraining orders, such evidence adds little to the existing impeachment evidence. Further, under appellant's theory in the trial court, he would have had to produce witnesses who would testify that the women did not threaten to kill Beavers. The People would then have had an opportunity to call other witnesses to rebut that testimony. It would have devolved into a mini-trial.[3]

---

[3] Appellant also argued the protective orders were demonstrably "frivolous" because Beavers "abandoned" them, and the abandonment was shown in the documents. As the trial court explained "frivolous" would mean the things in the protective order did not happen. Appellant would have to call witnesses to

9

Similarly, if appellant's theory was that Beavers did not have a "real" fear of appellant and was indeed the aggressor all along, telling the jury about the nature of the previous threats was not necessary to enhance this argument. Beavers testified he was afraid because appellant said he would be back. However, when he was afraid in the past, he called the police or applied for temporary restraining orders, as the jury was advised. This time, he armed himself, unlocked the gate, and admitted appellant into the motel courtyard. Beavers's undisputed conduct contradicted his claimed "fear" of appellant, supporting the argument that Beavers contrived the fear. He was not afraid; instead he was proactively and illegally taking matters into his own hands. The nature of the prior threats against Beavers adds minimal value to appellant's defense. The trial court did not abuse its discretion under Evidence Code section 352.

B.     *The Limitation on Cross-Examination Did Not Violate Appellant's Confrontation Rights.*

A criminal defendant has the right under the California and federal constitutions to confront the witnesses against him. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 15.) The Confrontation Clause " 'guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' (*Delaware v. Fensterer* (1985) 474 U.S. 15, 20 [88 L.Ed.2d 15, 106 S.Ct. 292] (*per curiam*).)" (*People v. Wilson* (2008) 44 Cal.4th

---

demonstrate this. As for abandonment, as the trial court noted, that could be related to the state of Beavers's relationship with the women: "you're happy one day and not happy the next day, that's life."

10

758, 794.) "Although we recognize that a criminal defendant has a constitutional right to present all relevant evidence of *significant* probative value in his favor [Citations], '[t]his does not mean that an unlimited inquiry may be made into collateral matters; the proffered evidence must have more than "slight-relevancy" to the issues presented.' [Citation.] ' "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." ' " (*People v. Jennings* (1991) 53 Cal.3d 334, 372 (*Jennings*).)

Trial courts have broad discretion to impose reasonable limits on cross-examination, "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679.) A trial court's decision under Evidence Code section 352 to limit cross-examination of marginal impeachment value that would entail undue consumption of time does not violate a defendant's constitutional right to confrontation and cross-examination. (*People v. Pearson* (2013) 56 Cal.4th 393, 455; see *Jennings*, *supra*, 53 Cal.3d at p. 372.) Unless the defendant can show that the prohibited cross-examination would have produced a " 'significantly different impression' " of the witness's credibility, the trial court's exercise of its discretion does not violate the Sixth Amendment. (*Pearson*, at pp. 455–456.)

As we have discussed, the trial court did not abuse its discretion in finding the threat evidence had little impeachment value and would require an undue consumption of time.

11

Admitting the nature of the prior threats by the two women would not have produced a significantly different impression of Beavers whose credibility was undermined by multiple prior convictions, multiple omissions and lies, participation in unlawful activity (drug dealing and carrying a weapon) at the time of the shoot-out, and evidence of multiple motives to lie. The trial court's exclusion of the evidence did not violate appellant's right to confront and cross-examine Beavers.[4]

C.    *Defense Counsel Was Not Ineffective in Failing to Object to the Prosecutor's Closing Argument and Re-Direct Examination of Detective Shear.*

Appellant contends the prosecutor committed prejudicial misconduct when (1) he incorrectly told the jury Beavers had testified appellant pointed his gun at Beavers's head; and (2) he

---

[4]    In a different vein, the trial court noted that the facts of the protective orders were quite different from the facts of the present case. We agree. In the paperwork applying for the temporary restraining order, Beavers described Jarvis as a woman with mental issues who took a "wash up" in his front yard using his water hose, and who was "a threat to herself and her child." It was possible that Beavers had been in a romantic relationship with her, as he reported that she asked for money from him for her child. As for Jones, Beavers definitely had been in a romantic relationship with her and claimed that the threats occurred after he ended the relationship due to Jones's "real bad" cocaine use. Beavers's reactions to death threats from two troubled women with whom he had some sort of relationship has almost no tendency to explain or undermine his claim that he perceived an imminent threat when a strange man knocked on his door in the middle of the night asking where he was from and whether he was selling drugs.

12

asked Detective Shear if the surveillance video was consistent or inconsistent with Beavers's account of events.

Appellant did not object to the argument or the direct examination of Shear and did not request a curative admonition. He does not contend an objection or admonition would have been futile.  Accordingly, he has forfeited these claims.  (*People v. Brown* (2003) 31 Cal.4th 518, 553; see *People v. Gurule* (2002) 28 Cal.4th 557, 627.)

Appellant contends if the claims are forfeited, his trial counsel's inaction constituted ineffective assistance of counsel.

A defendant has the burden of proving he received ineffective assistance of counsel.  (*People v. Pope* (1979) 23 Cal.3d 412, 425.)  To establish such a claim, defendant must show that his counsel's performance fell below an objective standard of reasonableness.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218.) " ' "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " ' " (*People v. Thomas* (1992) 2 Cal.4th 489, 530–531.)  "If the record 'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 746.)

"[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502.)  We accord great deference to counsel's tactical decisions, and we have explained that courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight.  Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 86 (*Coffman and Marlow*).)

A prosecutor's comments are viewed as a whole, not in isolation, to determine whether a prosecutor has committed misconduct.  Generally, a prosecutor's comments suggesting that he has some "secret knowledge" that was not presented to the jury can be viewed as prosecutorial misconduct.  (*People v. Avila* (2009) 46 Cal.4th 680, 714.)

1.  *Counsel's Failure to Object During Closing Argument Did Not Constitute Ineffective Assistance.*

Appellant contends the following three statements constituted misconduct: (1) "[W]e know from Mr. Beavers that he admits, after the defendant shot, after the defendant pointed the gun at his head, Mr. Beavers hit the gun back up in the air, that Mr. Beavers took out his own gun and fired back."  (2) "We've heard Mr. Beavers' testimony that the defendant pointed the gun at his head."  3) "The defendant pointed the gun at Mr. Beavers' head."

Appellant contends, and respondent agrees, that Beavers did not testify at trial that appellant pointed the gun at his

14

head.[5]  However, the first and third statements above do not attribute the statement directly to Beavers's testimony.  The record shows that Detective Shear testified Beavers told him in previous interviews that appellant pointed the gun at his head.  Thus, appellant's counsel acted reasonably in not objecting to those statements.

The second statement does state that Beavers testified appellant pointed the gun at his head.  The statement, while incorrect, does not imply the prosecutor had some knowledge outside the record.  The prosecutor explicitly said "*We've* heard Mr. Beavers' testimony . . . ."  Nor was the prosecutor acting as his own witness to bring in evidence not otherwise found in the record.  There was evidence in the record of Beavers's statement, just from a different source than the prosecutor mentioned.  Further, Beavers was not specifically asked during trial if appellant pointed a gun at his head.  He simply did not mention it in response to open-ended questions about what happened.  Counsel could have decided that an objection that Beavers did not testify to the gun pointing at his head would not undermine Beaver's credibility but instead would draw attention to the fact that Beavers *did* make this statement to Detective Shear before trial.  Thus, counsel could have made a reasonable tactical decision not to object.

This is particularly reasonable since defense counsel chose to attack Beavers's credibility during his closing argument on his own terms:  he tended to attack it in ways that referred to an external standard.  For example, on the subject of the initial moments of the encounter when Beavers claimed appellant

---

[5]    Beavers did so testify at the preliminary hearing.

15

pointed the gun at his head, appellant's counsel focused on Beavers's testimony that he burned his hand on appellant's gun at that time. Counsel argued that Beavers's claim was not believable because Beavers said "he knocked the gun out. He didn't grab it."[6]

We give great deference to a counsel's tactical decisions and do not " ' " 'second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight.' " ' " (*Coffman and Marlow*, *supra*, 34 Cal.4th at p. 86.)

> 2. *Counsel's Failure to Object to the Redirect Examination of Detective Shear Did Not Constitute Ineffective Assistance.*

Appellant points out that the prosecutor asked the detective whether Beavers gave statements which were consistent or inconsistent with the surveillance video. Appellant equates this with improperly eliciting one witness's opinion of the credibility of another witness's extrajudicial statements.

Counsel could have made a reasonable tactical decision not to object. The questions to which appellant now objects were made during redirect examination. Defense counsel had already

---

[6] This approach was reflected in appellant's overall defense strategy, which focused not on whether appellant's actions (such as pointing a gun at Beavers's head) might have been perceived as a threat by Beavers, but on who fired the first shot. Defense counsel acknowledged there were "two theories of this case" but argued: "[I]t all revolves around one fact, who fired first. That is the central part of this case, who fired first." This emphasis allowed defense counsel to emphasize the neutral and objective surveillance video, which in his view, showed that Beavers fired first.

16

extensively cross-examined Detective Shear on this topic, particularly on inconsistencies, as the prosecutor noted before beginning his own questions on redirect examination. The prosecutor stated: "So the defense asked you a series of questions about your interviews with Mr. Beavers and how they compare with the video." The prosecutor continued: "So based off of the statements that Mr. Beavers gave to you, how were they consistent or inconsistent with the video you have?" The trial court was unlikely to prevent the prosecutor from asking questions on this topic after allowing defense counsel to ask similar questions. (*People v. Steele* (2002) 27 Cal.4th 1230, 1247-1248 [trial court has discretion "to prevent unfairness to either side when one side presents evidence on a point, then tries to prevent the other side from responding"].) Assuming an objection would have been meritorious, counsel could reasonably have decided not to object and risk the trial court instructing the jury to disregard *all* of Detective Shear's testimony on this topic.

In addition, some of Detective Shear's answers were directly helpful to appellant, as counsel must have anticipated from his cross-examination of the detective. The detective confirmed the video showed Beavers had omitted, notably, firing a shot into the street. Appellant's counsel could reasonably have decided not to object because, on the whole, appellant had more to lose than to gain by objecting to the detective's redirect testimony about the video.

We give great deference to a counsel's tactical decisions and do not " ' " 'second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight.' " ' " (*Coffman and Marlow*, *supra*, 34 Cal.4th at p. 86.)

17

## DISPOSITION

The judgment of conviction is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

                                        STRATTON, J.

We concur:


        GRIMES, Acting P. J.


        OHTA, J.*

---

\*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18